UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
IN RE: 73 EMPIRE DEVELOPMENT LLC,    :    Case No. 19-22285 (RDD)
                                                             :
                                                              :
                                                              :
                             Debtor.                  :
-----------------------------------------------------------------x

### OPPOSITION OF MDL EQUIPMENT CORP. TO DEBTOR'S MOTION FOR A DECLARATORY JUDGMENT ON GROUND LEASE

MDL Equipment Corp. ("MDL") submits this opposition to the motion of Debtor 73 Empire Development LLC ("Debtor") for a declaration that the lease, dated December 16, 2013 between MDL, as landlord, and Debtor, as tenant (the "Lease), for the premises at 73 Empire Boulevard, Brooklyn, New York (the "Premises") is not a true lease. This motion should be denied and the Court should declare that the Lease is a true lease pursuant to § 365 of the Bankruptcy Code. Debtor has not met its substantial burden to overcome the "strong presumption that a deed and lease…are what they purport to be." In re PCH Associates, 804 F.2d 193, 200 (2d Cir. 1986).[1]

### Preliminary Statement

1. Debtor's motion (the "Motion") should be denied because Debtor has failed to demonstrate that the Lease is anything other than a typical ground lease. The facts relied on by Debtor, namely the length of the term of the Lease, the fact that it is "triple net" to MDL, and the fact that the Lease required Debtor to improve the Premises, do not, individually or in combination, distinguish the Lease from any other ground lease. They therefore provide no basis

---

[1] Debtor's motion is procedurally odd. It seeks a declaratory judgment although there is no underlying complaint or claim for this relief. To the extent that this motion is akin to a motion for summary judgment, Defendant has clearly failed to eliminate all material issues of fact as to the characterization of the Lease as anything other than a true lease. See In re PSINet, Inc., 271 B.R. 1 (Bankr. S.D.N.Y. 2001). Debtor has also neglected to attach the Lease to its papers. It is attached to the accompanying affidavit of Dennis Glass, sworn to July 11, 2019 (the "Glass Aff."), as Exhibit A.

for re-characterizing the Lease. Indeed, Defendant has previously and repeatedly admitted that the Lease is a true lease.

2. Finally, Debtor argues that the Lease must be re-characterized because, it claims, the rent reserved thereunder was less than market rent. However, Debtor's valuation (essentially rendered by the Debtor itself but dressed up as an independent opinion (<u>see</u> Affidavit of Karen S. Frieman, sworn to July 12, 2019, ¶ 13 and Exhibit L)), does not withstand scrutiny. Instead, as demonstrated by the attached expert opinion of Marc J. Nakleh, executive director of Cushman & Wakefield, the reserved rent does in fact reflect the market. (Exhibit A.) Debtor has provided no basis for finding that the Lease is anything other than a "true lease." The Motion should be denied.

<u>The Parties Understood the Lease to be a Lease Only</u>

3. As set forth at greater length in the Glass Aff., the formation of the Lease had none of the indicia of anything other than a lease. The Premises were not chosen by Debtor for purchase by MDL or purchased with Debtor in mind, but were owned by MDL long before the Lease was executed. MDL did not finance Debtor. As Mr. Glass attests, at the time of the Lease, MDL did not want to sell the Premises, but, rather was looking for a tenant. It worked with a number of brokers in its effort to find a tenant, and ultimately paid a brokerage commission to a broker, Sapphire Realty, who had specifically sought and found Debtor as a tenant. (Glass Aff., ¶ 2 and Exhibits B and C.) Indeed, the Lease confirms that that broker was used. (Glass Aff., Exhibit A, Article XXIII.)

4. After the parties came to terms, the Lease, denominated as such, was executed and a memorandum of same was recorded. The parties chose how to structure and memorialize their business arrangement and they entered in a lease. Debtor points to no reason why the parties entered into a lease if they intended to create a different kind of interest, including a "sale

2

for a term of years," which Debtor now claims, for the first time six years after the Lease was executed, is what was created. Clearly the parties intended to, and did, create a leasehold interest for Debtor.

5. In fact, it is significant that the parties agreed to include Article XVIII in the Lease, which provides Debtor, during the term of the Lease, with a right of first refusal in the event MDL desires to sell the Premises. Such a provision is inimical to Debtor's new claim that the Lease is a disguised sale.

6. In addition, Debtor's own filings in connection with the Lease disclose that it treated the Lease as only as transfer of a leasehold interest and not an ownership interest. Thus, Debtor executed a Combined Real Estate Transfer Tax Return identifying the Lease as a "Leasehold grant" and not any other kind of conveyance. (Frieman Aff., Exhibit M, p. 1 (n).)

7. Debtor's actions continued to reflect its understanding that the Lease is a lease. For example, in February, 2015, Debtor asked MDL to enter into a Non-Disturbance and Recognition Agreement with respect to a proposed subtenant, Dollar Tree Stores. That agreement, signed by Debtor, recites that "Prime Landlord [MDL] is currently the fee owner" of the Premises and that MDL "<u>leases the Building</u> to Sublandlord [Debtor]." (Glass Aff., Exhibit D); emphasis supplied.)

8. Moreover, contrary to its claim to in some sense own (rather than lease) the Premises, Debtor subsequently requested that MDL grant it an option to purchase the Premises. On or about October 5, 2016, Debtor emailed to MDL, a draft "Second Amendment to Ground Lease" which recited that the parties were party to a ground lease and proposed adding to the Lease an option for Debtor to purchase the Premises. (Glass Aff. Exhibit E, ¶¶ 1(a)-(c).) MDL declined this request. (Glass Aff., ¶ 5.) Debtor's request for an option to purchase the Premises cannot be reconciled with its present assertion that the Lease is a disguised purchase.

### Debtor Admitted in the State Court Action that the Lease is Just That

9. As the Court is aware, pursuant to Article 11 of the Lease, MDL served Debtor with a Notice of Default dated March 29, 2019, citing various defaults under the Lease including defaults arising from Debtor's failure to improve the Premises and to properly insure same. The Notice of Default, demanded that the defaults be cured or that the cure of same be commenced by May 4, 2018.

10. In response, Debtor commenced an action against MDL in the New York Supreme Court, Kings County, titled <u>73 Empire Development LLC v. MDL Equipment Development LLC</u> (Index No. 509099/2018) (the "State Court Action"). In its verified complaint in that action, Debtor alleged:

> <u>Pursuant to a written commercial agreement dated December 16, 2013, the parties entered into a lease agreement for the Premises</u> whose initial term expires in the year 2062 (the "Lease").

(Frieman Aff., Exhibit A, ¶ 4; emphasis supplied.)

11. The commencement of the State Court Action was a predicate to Debtor's motion for a Yellowstone injunction tolling the cure period under the Notice of Default. It is well-settled New York law that the purpose of a Yellowstone injunction is to permit <u>a commercial tenant</u> accused of defaulting under its lease to obtain a stay tolling the running of the applicable cure period pending a determination on the merits of the noticed defaults so that if it is found to be in default, it has time to cure the default and preserve its interest in the lease. See <u>Graubard Mollen Horowitz Pomeranz & Shapiro v. 600 Third Ave. Assoc.</u>, 93 N.Y.2d 508, 514 (1999); <u>Mann Theatres Corp. of Cal. v. Mid-Island Shopping Plaza Co.</u>, 94 A.D.2d 466, 475 (2d Dept. 1983).

12. It is also well-settled New York law that in order to obtain a Yellowstone injunction, a tenant must demonstrate that:

> (1) it holds a commercial lease; (2) it received from the landlord either a notice of default, a notice to cure, or a threat of termination of the lease; (3) it requested injunctive relief prior to the termination of the lease; and (4) it is prepared and maintains the ability to cure the alleged default by any means short of vacating the premises.

Graubard Mollen, 93 N.Y.2d at 514 (internal citations omitted; emphasis supplied).

13. A Yellowstone injunction is not available unless the agreement between the parties is a commercial lease. See CC Vending, Inc. v. Berkeley Educ. Servs. of N.Y., Inc., 74 A.D.3d 559, 559-60 (1st Dept. 2010) (licensee denied Yellowstone injunction because it "was not a commercial lessee"); McBride v. Taranto, 2018 WL 3354048 at ** 3-4 (Sup. Ct. Suffolk Co. July 9, 2018) (in case involving residential lease Yellowstone denied where plaintiffs "failed to establish the first element for a Yellowstone injunction, that it held a commercial lease...").

14. Here, Debtor sought a Yellowstone injunction and in doing so thereby conceded that the Lease is a "true" commercial lease. Indeed, in connection with its motion for Yellowstone injunctive relief, Debtor repeatedly and expressly asserted that the Lease was a commercial lease – and not a sale for the term of years as it now posits.[2]

15. Thus, in the affirmation of Chiskel Strulovitch, dated May 3, 2018 (the "Strulovitch Aff."), Mr. Strulovitch affirmed:

> 1. I am a member of 73 Empire Development LLC ("Tenant" or "Plaintiff") the triple net tenant of the Premises at 73 Empire Boulevard, Brooklyn New York…
>
> 2. Plaintiff seeks a *Yellowstone* injunction barring MDL Equipment Development LLC ("Landlord" or "Defendant") from proceeding further with its improper efforts to terminate a commercial lease agreement between the parties (the "Lease") related to the Building located at 73 Empire Boulevard, Brooklyn, New York…

(Frieman Aff., Exhibit B; emphasis supplied.)

---

[2] Debtor's motion for a Yellowstone injunction was denied by Decision and Order entered on October 11, 2018.

16. Similarly, in its moving memorandum of law in support of the Yellowstone injunction motion, Debtor stated it was seeking relief "barring Defendant from proceeding further with its improper efforts to terminate <u>a commercial lease agreement</u> between the parties." (Frieman Aff., Exhibit C, p. 1; emphasis supplied.) Debtor further stated that "<u>Plaintiff holds a binding commercial lease agreement</u> that will not expire – at the earliest – until the year 2062." (Id., p. 5; emphasis supplied.) (<u>See</u> also, Frieman Aff., Exhibit D, Affirmation of Joseph M. Claro dated June 21, 2018, in support of motion for Yellowstone injunction, ¶ 2.)

17. Mr. Claro's May 3, 2018 Emergency Affirmation in Support of Debtor's application for a temporary restraining order pending decision on its motion for Yellowstone injunctive relief, also states that the Lease is "a commercial lease agreement between the parties." (Frieman Aff., Exhibit E, ¶ 3).

18. Debtor continued to properly characterize the Lease as a commercial lease (and not a sale for a term of years) in Mr. Strulovitch's reply affirmation and in Mr. Claro's reply affidavit, both submitted in further support of the Yellowstone injunction. (Frieman Aff., Exhibit F, ¶ 2; Exhibit G, ¶ 2.)

19. Further, in its reply to MDL's verified counterclaims in the State Court Action, Debtor <u>admitted</u> MDL's allegation that "MDL is the landlord and Tenant is the tenant pursuant to…[the] Lease." (<u>Compare</u> Counterclaim, Frieman Aff., Exhibit H, ¶ 54 and Reply, Frieman Aff., Exhibit I, ¶ 3.)[3]

20. Even after its bankruptcy filing (and even after it made this Motion), Debtor has referred to the Lease as a commercial lease in the State Court Action. Mr. Strulovitch's affirmation, dated June 24, 2019, submitted in support of its cross-motion and in opposition to

---

[3] Debtor served the reply on or about November 11, 2018, three months after it was due. MDL has asserted it should not be accepted in the State Court Action.

6

MDL's motion for summary judgment, states that Debtor is "the triple net tenant" of the Premises (Frieman Aff., Exhibit J, ¶ 1), and that the Lease is a "commercial lease agreement." (Id., ¶ 3; see also, id., ¶ 12 (Lease is a "triple net lease").

21. Similarly, in its Memorandum in Support of Cross-Motion and in Opposition to Defendant's Motion Seeking Summary Judgment, dated June 25, 2019, Debtor correctly identifies the Lease as a "commercial lease agreement." (Frieman Aff., Exhibit K, p. 1.)

22. Debtor cannot avoid these admissions or be permitted to change its position as the wind blows.

### The Lease Should Not be Re-Characterized

23. Even if Debtor could avoid all of the above, and it cannot, Debtor has not and cannot meet its substantial burden to overcome the presumption that the Lease is a "true lease."[4]

24. Debtor seeks to demonstrate that the Lease is not a "true lease" by referring to the length of the Lease and the fact that it is triple net as to MDL. Thus, Debtor asserts that "the parties did not intend to enter into a typical landlord tenant relationship," but rather intended to give Debtor "sole dominion over the land for fifty years and then the land would revert to the Ground Lessor improved by a large building." (Motion, ¶¶ 10, 26, 32.)

25. However, in noting these aspects of the Lease, Debtor has only described the essence of a typical ground lease, as demonstrated in the accompanying expert report of Cushman & Wakefield (Exhibit A), and as conceded by Debtor's expert, Avison Young. (Motion, Exhibit B.) See also 4E N.Y. Prc, Com. Litig. In New York State Courts, § 120:4.[5]

---

[4] Debtor assumes that federal law applies to this inquiry. That is not a position universally adopted in this Circuit. See PSINET, 271 B.R. at 42-43.

[5] MDL also takes issue with the idea that Debtor has "sole dominion" over the land. Under the Lease (Glass Aff., Exhibit A), MDL has the right, inter alia, to approve the use of the Premises (Section 4.3); inspect the Premises (Article XV); perform if Debtor fails to (Section 13.1 and Article XV); approve improvements to the Premises (Sections 4.6(ii) and 4.7); approve any application to sublease or assign the Lease (Article X); and the right to recover the Premises, where, as here, Debtor breaches the Lease. (Articles XI and XVI.)

26. Indeed, the courts also have held that these factors are not uncommon in ground leases and their presence does not support the re-characterization of the Lease sought by Debtor.

27. Thus, in <u>International Trade Admin. v. Rensselaer Polytechnic Institute</u>, 936 F.2d 744, 749-50 (2d Cir. 1991), the court held that the fact that a lease has a long term "does not automatically signal that an agreement is not a true lease…" The Second Circuit also rejected the assertion made here by Debtor that the fact that a ground lease is triple net demonstrates that the Lease is not a lease:

> …the indicia of ownership in the lessee are a factor in our decision, we caution that this factor, too, should not be viewed in isolation. To do so would be misleading because of the increasingly common use of "triple net" leases. In a typical triple net lease, the rent stated is "net" to the landlord because the tenant takes responsibility for taxes, operating expenses and the like…This arrangement assures the landlord that he will actually receive the lease's stated profits and that they will not be subject to any expenses other than typical income tax. It may appear in a typical triple net lease, then, that the lessee assumed many of the responsibilities of ownership. <u>This superficial shifting of costs in a triple net lease, taken alone, should not be interpreted to mean than an agreement is not a lease for purposes of § 365(d)(4)</u>.

936 F.2d at 751 (emphasis supplied); <u>see</u> <u>also</u> <u>In re Integrated Health Services, Inc.</u>, 260 B.R. 71, 77 (Bankr. D. Del. 2001) ("…a triple net lease is not an unusual term in a true lease"); <u>In re Barney's Inc.</u>, 206 B.R. 328, 336 (Bankr. S.D.N.Y. 1997); <u>In re Hotel Syracuse, Inc.</u>, 155 B.R. 824, 840 (Bankr. N.D.N.Y. 1993); <u>Matter of Lansing Clarion Ltd. Partnership</u>, 132 B.R. 845, 850 (Bankr. W.D. MI. 1991). Indeed, in <u>In re Anchorage Sportsplex, Inc.</u>, 462 B.R. 722, 732 (Bankr. D. Ala. 2010), the court noted the continuing obligations of the tenant as evidence that the lease <u>was</u> a true lease.

28. Similarly, in <u>Westship, Inc. v. Trident Shipworks, Inc.</u>, 247 B.R. 856, 863 (Bankr. M.D. Fla. 2000), the court held that the fact that a lease may obligate the tenant to perform many functions often performed by owners is not determinative because that is common in triple net

leases. There, the lease was held to be a true lease because, inter alia, the land and building remain the property of the landlord upon termination of the lease and there was no option to purchase the leased property at the end of the lease term. 247 B.R. at 863-64. So too here, Debtor has no option to purchase the Premises at the end of the term when they will revert to MDL. (Glass Aff., Exhibit A, Lease, Article XVI.)[6]

29. In In re George, 177 F.3d 885, 888 (9th Cir. 1999), the Court of Appeals affirmed the finding below that the parties' lease was a true lease based on the facts that the tenants were required to pay rent over the course of the agreement based on the fair market value of the property; that there were penalties for late rent payments; that the tenant was required to post a security deposit; that the tenant did not have fee title to the property; and that the landlord would take control of the land if the lease was terminated.

30. These factors are all present in the Lease, which requires rent payment through the term of the Lease (Glass Aff., Exhibit A, Article II); requires Debtor to pay late fees if rent is not paid on time (Article VII); required the posting of a security deposit (Article XIX) (as well as the guarantee of Mr. Strulovitch (Article XXVI)); did not transfer the fee interest to Debtor; and provided for the return of the land and building to MDL upon the termination or expiration of the Lease (Article XVI.) As in In re George, the Lease is clearly a "true lease."

31. In contrast, PCH, on which Debtor seeks to rely, is entirely distinguishable. There, the lease was specifically and admittedly designed as a sale-leaseback arranged for tax and investment advantages and was part of a transaction where the land and building were separately acquired by two entities involved in the transaction. 804 F.2d at 194. Here, in contrast, there is no evidence that the Lease was entered into as part of or to disguise a financing transaction. It was not.

---

[6] Of course, it is MDL's position that the Lease has already terminated.

9

32. In fact, Debtor does not claim that the Lease was a financing transaction as was the case in the authorities cited by Debtor where the Lease was re-characterized. See In re Moreggia & Sons, Inc., 852 F.2d 1179 (9th Cir. 1988); PCH, 804 F.2d 193; In re KAR Development Associates, L.P., 180 B.R. 629 (D. Kan. 1995); Hotel Syracuse, 155 B.R. 824.

33. Instead, Debtor relies on International Trade, and argues that the Lease is "fee simple determinable" or a "sale for a term of years." It is unclear what this somewhat archaic term is intended to mean. However, what the Court made clear in International Trade, was that the deciding factor in its decision that the lease there was not a true lease was the fact that the tenant pre-paid 99 years' worth of rent in the first three years of the lease. 936 F.2d at 751. The existence of pre-payments was also the key to the court's decision in In re Worldcom, 343 B.R. 430 (Bankr. S.D.N.Y. 2006), where, in determining whether Worldcom had any interest arising from its Right to Use agreement pertaining to certain telecommunications fibers, the Court noted that the concept of a sale for a term of years aptly described Worldcom's interest.

34. Under the Lease, rent is paid on a monthly basis throughout the term of the Lease. (Glass Aff., Exhibit A, Section 2.1.) There is no pre-paid rent. Therefore, in order to fit within the category of a "sale for a term of years," as described in International Trade, Debtor argues (without support) that its projected development costs for the Premises in the alleged amount of $20,000,000 are in the nature of pre-paid rent. (Motion, ¶¶ 10, 26.) However, as established in the Cushman & Wakefield report, it is nothing of the kind. Rather, as is the case in all ground leases, the Debtor undertook to develop the Premises for its own benefit so as to be able to recoup its construction costs along with an acceptable profit over the term of the lease by renting the Premises to its own tenants. (See, Exhibit A.) Those improvements do not benefit MDL

other than to insure that the Debtor will be able to pay the ground rent. Therefore, as Cushman & Wakefield opines, it is not proper to consider those costs as pre-paid rent to MDL.[7]

35. There is no basis for finding that the Lease is a "sale for a term of years."[8]

36. Debtor is thus left to allege that the Lease is not a true lease because the rent due thereunder was not market rent and bears no relationship to the fair market value of the land. (Motion, ¶ 27.) This assertion is not supported by Debtor's "expert" and is without merit.

37. As an initial matter, Debtor's authorities, KAR Development, 180 B.R. 629, and Moreggia, 852 F.2d 1179, are easily distinguished.

38. In Moreggia, the City of San Francisco was obligated by law to relocate certain businesses, including the debtor's, displaced by the city's redevelopment project. As a result, the debtor obtained a right to use stalls in the Produce Terminal for 50 years at a rate specifically calculated to provide funds to retire the bonds which had been issued to finance the terminal. 852 F.2d at 1180. That rental obligation ceased when the bonds were retired and debtor had no other executory burdens under the "lease." Id. at 1180, 1184. The arrangement was described by the Court as "unique," id. at 1184, and the court concluded that the lease agreement was not a true lease holding:

> The sui generis property interest embodied in the "Lease" is not subject to section 365 (d)(4). This transaction involved a "peculiar" arrangement, Lease Agreement, section 23, ¶ 6, that created a property interest other than a bona fide leasehold. Morreggia's interest is a

---

[7] Debtor speaks of expending "about $20,000,000" within the first few years of the Lease. (Motion ¶ 9.) In fact, no improvements have been made and little, if any, of that $20,000,000 has been spent in the last nearly six years. MDL disputes Debtor's repetition in the motion of the steps it allegedly previously took to develop the Premises. (Motion, ¶ 3.) It also disputes Debtor's well-rehearsed (and meritless) arguments about waiver and its alleged efforts to assign the Lease. (Motion, ¶¶ 12-21.) Finally, in its motion, made prior to the recent court order directing rent to be paid to MDL, Debtor claims it is escrowing rent. (Motion, ¶ 22.) Although Debtor made an initial payment, no rent has been received for July, 2019, as of the filing of this opposition.

[8] A Westlaw search has not discovered any New York cases using that term since 1888. The Cushman & Wakefield report indicates it is not a term used in the New York real estate market. The only other federal bankruptcy cases found using the term "sale for a term of years," merely mention the term and do not apply it. Anchorage, 462 B.R. 722; In re Enron Corp., 367 B.R. 373 (Bankr. S.D.N.Y. 2007); Matter of Tak Broadcasting Corp., 137 B.R. 728 (W.D. Wisc. 1992).

> prepaid right of possession for a substantial term…with no material future obligations…

Id. at 1186.

39. Similarly, in KAR Development, the city of Olathe, Kansas, pursuant to state statute, issued industrial revenue bonds to finance, in part, the construction of a hotel by KAR. The City held title to the underlying property, chosen by KAR, which was then leased back to KAR pursuant to a lease agreement. The lease, for a term of 24 years, provided KAR with an option to buy the hotel at the end of the lease term (and the City was barred from selling the property before the end of the term) and called for rent calculated at the exact amount of the principal and interest payments due under the bonds to be paid, not to the City, but to its bond serving agent. 180 B.R. at 631, 639. The agreement between KAR and the City was called a lease to satisfy the statutes underlying the bond issuance and for tax advantages. Id. at 639. The court held that the lease was not a true lease.

40. Nothing could be further than the situation presented by the Lease which is a typical ground lease under New York law. Debtor remains liable for rent and for myriad other obligations under the Lease through its termination and/or expiration. As set forth below, the rent is not tied to any external factors such as servicing bonds or other financing, but rather is set in accordance with market factors. Moreggia and KAR Development are entirely inapt.

41. In any event, Debtor has not established that the rent under the Lease is below market. Debtor argues that the rent should have been $903,570. (Motion, ¶ 5.) However, it provides no basis to support that conclusion.

42. Further, Debtor has provided no independent analysis of the rent under the Lease. Rather, its argument is based on the report of FIA Capital Partners ("FIA"). Debtor fails to disclose, however, that the principal of FIA, David Goldwasser, is also a principal of Debtor and in fact, signed the Petition in this case. (Frieman Aff., Exhibit L.)

43. In any event, the FIA report is not valid. Rather, as the Cushman & Wakefield report demonstrates, the rent under the Lease was entirely market based. (Exhibit A.)

44. The Cushman & Wakefield report explains that when entering into a new ground lease, the annual ground rent is typically established based on a market rate of return applied against the unencumbered market value of the property. In particular, annual ground rents range between 4.5% and 7.0% of the unencumbered market value of the underlying property. Adopting FIA's proposed market value of the land of $6-$7 million (Motion, Exhibit A, "Summary"), the annual ground rent of $400,000 set by the Ground Lease (Glass Aff., Exhibit A, Lease, Section 2.1), reflects 5.7% to 6.7% of the market value, well within the typical commercial range. In other words, the annual rent under the Ground Lease is market rent.

45. Debtor attempts to demonstrate that the rent under the Ground Lease is lower than market rents by comparing Ground Lease rent to alleged rents for retail spaces. (Motion, Exhibit A, "Rent Comps.") This is an inappropriate and invalid comparison. In fact, as explained in the Cushman & Wakefield report, "…it is the very spread between the ground rent and the market rents that will provide the Tenant's return of, and return on, capital." (Exhibit A.)

46. Debtor similarly argues that the rent under the Lease is "lower" than retail rents to reflect the fact that Debtor is obligated to improve the Premises. (Motion, ¶¶ 6, 27.) However, this obligation is the essence of a ground lease and as demonstrated in the Cushman & Wakefield report, the rent here is market rent for such a lease.[9]

47. Finally, Debtor asserts that it has presented an opinion from Avison Young to the effect "that lenders treat a ground lease as a loan against real property, not a loan against a lease." (Motion ¶¶ 11, 30, 31.) However, the Avison Young email says nothing of the kind.

---

[9] Debtor attempts to bolster its effort to conflate its improvements obligations and its obligation to pay rent by citing to section 2.2 of the Lease when referring to the improvements obligation. (Motion, ¶ 6). However, section 2.2 says nothing about the improvements obligation.

(Motion, Exhibit B.) In addition, Cushman & Wakefield has refuted this unsupported conclusion. (Exhibit A, p.p. 9-10.) Indeed, the Lease itself reflects that any loan to be obtained by Debtor would be against its <u>leasehold</u> interest, and not the land. (Glass Aff., Exhibit A, Article XVI.)[10]

48. Debtor has failed to demonstrate that the "economic realities" of the Lease reflect anything other than a common ground lease.

<u>Conclusion</u>

49. For all the foregoing reasons, it is respectfully submitted that Debtor's motion for a declaratory judgment should be denied in its entirety.

Dated: July 15, 2019
      New York, New York

STERN TANNENBAUM & BELL LLP

By: ___s/Karen S. Frieman_____
     Karen S. Frieman
     Stefanie M. Miller
380 Lexington Avenue
New York, NY 10168
(212) 792-8484
(212) 792-8489 (fax)
*Attorneys for MDL Equipment Corp.*

To:   Mark A. Frankel, Esq.
      Backenroth Frankel & Krinsky LLP
      800 Third Avenue, 11th Floor
      New York, NY 10022
      (212) 593-1100
      (212) 644-0544 (fax)
      *Attorneys for Debtor 73 Empire Development LLC*

75141.DOC

---

[10] Treasury Regulation 1.1031(a)-(c), also relied on by Debtor, deals with like-kind exchanges. It also has nothing to add here.